UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| TERRY MCKINLEY, | Case No.: 15-cv-0228-WQH-BGS |
|---|---|
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| AMY MILLER, et al., | **[ECF NO. 149]** |
| Defendants. | |

Presently before the Court is a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendant B. Hugie. (ECF No. 149.) Plaintiff Terry McKinley filed an opposition to the motion. (ECF No. 153.) Defendant did not file a reply.

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c). For the reasons discussed below, **IT IS RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

/ / /

## I. BACKGROUND

### A. Factual Background

Plaintiff, a former state prisoner, was incarcerated at Centinela State Prison during the events relevant to this action. (First Am. Compl., ECF No. 22 at 1.)[1] Plaintiff's allegations and the record before the Court reflect the following:

On March 25, 2013, during a search of Plaintiff's cell, marijuana was found in clothing that Plaintiff alleges was left by another inmate in the area above his bunk. (*Id.* at 3.)

On April 15, 2013, Plaintiff filed a California Department of Corrections and Rehabilitation ("CDCR") Form 602 Appeal, Log No. CEN-13-00524, in which he sought release from Administrative Segregation ("Ad-Seg"), where he had been placed following the cell search. (Santana Decl., Ex. A, ECF No. 149-5 at 17, 19.) He claimed that the marijuana that was found belonged to an inmate who had been housed in his cell in violation of a CDCR policy precluding general population inmates such as himself from being housed with "unclassified transitional inmates." (First Am. Compl., ECF No. 22 at 3-4; Santana Decl., Ex. A, ECF No. 149-5 at 19.) He further asserted that due to routine negligent violations of that policy at Centinela, his cell "had been a revolving door for unclassified transitional [inmates], the most recent of which departed just days prior to the search." (*Id.*) Plaintiff's appeal bypassed the first level of review and was denied at the second and third levels on May 21, 2013, and October 14, 2013, respectively. (Santana Decl., Ex. A, ECF No. 149-5 at 17-18 (first level bypass), 15-16 (second level response), 9-10 (third level response).)

On July 25, 2013, Plaintiff was released back into the general population. (First Am. Compl., ECF No. 22 at 5.) He alleges that he "immediately felt tension" from other inmates and was approached by several inmates "who told him he had been labeled a

---

[1] The Court cites to documents as paginated on the electronic case filing system.

'snitch' by staff due to his 602 appeal on the drug possession charge." (*Id.*) Plaintiff states that his "last cellmate confronted him on the recreation yard and said he'd been told (by staff) that Plaintiff tried to pin the marijuana charge on him." (*Id.*)

Plaintiff alleges that "[i]t came to his attention that [correctional officers] Hugie and Premdas were responsible for slandering him and defaming his character" in retaliation for "exposing [Centinela's] underground policy of housing [inmates] together of different classification statuses" and "filing numerous [602s]." (*Id.*) On August 17, 2013, Plaintiff claims that he and another inmate, Adams, approached Defendant Hugie and asked him "what was the deal with him spreading false rumors on him," to which Hugie allegedly replied, "It came from high up." (*Id.*)

Defendant Hugie confirms that Plaintiff approached him on August 17, 2013. (Hugie Decl., ECF 149-4 at 2.) He denies ever informing Plaintiff of a directive from "higher up" to spread false rumors about Plaintiff being a "rat" or having acted as an informant. (*Id.*) He states that as a correctional officer, he had no role in processing inmate appeals, and was not aware of Plaintiff's appeal in which he alleged improper housing procedures. (*Id.*) Defendant Hugie further asserts that at no time was he directed to take any retaliatory actions against Plaintiff for submitting an appeal, or for any other reason. (*Id.*)

Plaintiff states that he "continued to program, but his problems were not over" as he "received hard looks and intimidating stares from [inmates] and staff daily." (First Am. Compl., ECF No. 22 at 5.) He further alleges that he "experienced different forms of harassment from staff, from lost property to missing documents supporting the many appeals he had filed." (*Id.*)

On September 4, 2013, Plaintiff filed Form 602 Appeal Log No. CEN-13-01272 in which he contended that prison staff had slandered his name and spread rumors about him; specifically, "[t]he word was pass[ed]" by Hugie and Premdas that he was a "rat." (Santana Decl., Ex. B, ECF No. 149-5 at 31, 33.) He recounted his allegation that Hugie had told him on August 17, 2013, that "it came from high up." (*Id.* at 33.) Plaintiff

3

15-cv-0228-WQH-BGS

claimed in his appeal that other inmates did not want him around, and that staff slandering his name was a breach of his safety and security. (*Id.* at 33.) He requested compensation for the time he had spent in Ad-Seg and for the slander and defamation of his character, as well as reinstatement to his previous job in B-Dining. (*Id.* at 31, 33.)

On September 14, 2013, Plaintiff met with a mental health clinician at the prison. (First Am. Compl., ECF No. 22 at 5; *id.*, Ex. E, ECF No. 22 at 29.) He reported having many problems with custody staff and requested a single cell chrono to avoid having additional problems with cellmates. (First Am. Compl., ECF No. 22 at 29.) He did not express any safety concerns. (*Id.*) Plaintiff followed up with the clinician a week later, on September 21, 2013. (*Id.* at 30.) He stated that he was doing fine and was not in need of mental health services. (*Id.*)

On October 16, 2013, following interviews with Plaintiff, correctional officers Premdas and Hugie, and inmates Adams and Gillison, a first level response was issued on Plaintiff's September 4, 2013 appeal which had been handled as a staff complaint (Appeal Log No. CEN-13-01272). (Santana Decl., Ex. B, ECF No. 149-5 at 29-30.) The appeal was partially granted in that an inquiry into Plaintiff's allegations had been conducted; however, a finding was made that staff did not violate CDCR policy. (*Id.* at 29.) The decision also indicated that all staff personnel matters were confidential and would not be shared with other staff, members of the public, or inmates. (*Id.* at 30.)

On November 5, 2013, Plaintiff submitted a second level appeal on Appeal Log No. CEN-13-01272 in which he expressed his dissatisfaction with the first level response. (Santana Decl., Ex. B, ECF No. 149-5 at 26.) Plaintiff stated that staff should "be more professional in dealing with issues like this because my life was in jeopardy on this yard." (*Id.* at 28.) He continued, "I can't say how it's going to be at the next place, due to inmate[s] that was told that I was in [Ad-Seg] snitching. Lies can get you hurt[.]" (*Id.*) A second level response dated November 14, 2013, confirmed the determination made at the first level. (Lewicki Decl., Ex. 5, ECF No. 150-2 at 14-15.)

///

     On November 21, 2013, Plaintiff pursued a third level appeal in which he indicated that he was "broaden[ing]" the scope of the appeal; he alleged that prison personnel other than Defendant Hugie acted on a "secret order that was given from higher up staff" and prevented his earlier release from Ad-Seg. (Santana Decl., Ex. B, ECF No. 149-5 at 26, 28.) His sole mention of Defendant Hugie was another recounting of Hugie's alleged "it came from higher up" statement. (*Id.* at 28.) Plaintiff did not indicate any safety concerns in this appeal. (*Id.* at 26, 28.)

     On February 4, 2014, an Appeals Examiner at the CDCR Office of Appeals issued a third level appeal decision determining that no relief would be provided in light of the previous investigation of Plaintiff's staff complaint, which confirmed that staff did not violate CDCR policy. (*Id.* at 23-24.) The examiner declined to address the new issues raised in Plaintiff's third level appeal. (*Id.* at 23.)

     In July 2014, Plaintiff received a new cellmate who was a "documented informant" according to prison yard rumor. (First Am. Compl., ECF No. 22 at 6.) At his deposition, Plaintiff identified this inmate as "Spears." (Lewicki Decl., Ex. A [Pl. Dep. (Apr. 5, 2023)] (hereafter "Pl. Dep."), ECF No. 150-1 at 11.) Shortly thereafter, according to his First Amended Complaint, Plaintiff overheard a conversation between two other inmates in which it was said, "Terry's name had smut on it, let him get it right by handling it." (First Am. Compl., ECF No. 22 at 6.) According to Plaintiff, "it" referred to "causing physical harm to his new cellmate." (*Id.*) Plaintiff states that "[w]hen the so-called 'order' came to carry out the 'hit,' Plaintiff refused." (*Id.*)

     At his deposition, Plaintiff recounted the above circumstances as follows:

> Q. So I want to talk about when Spears came into your cell, and you said you overheard a conversation between two other inmates.
>
> A. No, no. Let me help you out. I'm walking on the track of the yard and, you know, just man, let that motherfucker -- excuse my language -- Terry do it. But all the time, I kept on [] going where I was going and shining on because I didn't know

> what they were doing. And people that go into somebody else's business, they looking for trouble. I kept going on. Later, I find out that Spears actually did something that was actually on paperwork inmates had, and they wanted it took care of, but in the meantime, I was not going to do nothing to that kid.

(Pl. Dep., ECF No. 150-1 at 14.) He continued:

> A.   But like I say, I'm not dumb. I'm a street person. But when I hear it, it's like man, let Terry -- but I hear the name, but I don't know who made the call for me to do something. I don't know who made the call on me.

(*Id.* at 15.)

On July 30, 2014, Plaintiff was attacked. (First Am. Compl., ECF No. 22 at 6.) Plaintiff testified at his deposition that the attack occurred within days of overhearing the above conversation. (Pl. Dep., ECF No. 150-1 at 16.) He does not know who assaulted him. (*Id.* at 19, 21.)

A medical report prepared on the date of the attack reflected that Plaintiff sustained a fracture to his face and swelling on his eye and cheek. (Lewicki Decl., Ex. 6, ECF No. 150-2 at 19.) Plaintiff did not make a statement regarding the circumstances of his injury at that time. (*Id.*) Later medical reports dated March 7, 2016, and March 10, 2016, indicated that Plaintiff sustained a concussion in the attack. (First Am. Compl., Ex. F, ECF No. 22 at 32, 36.)

Plaintiff alleges that "[t]he attack and [his] resulting loss of mental acuity [were] the culmination of the malicious and vindictive rumor spreading carried out by the administration, namely [correctional officers] Hugie and Premdas[,] ordered from "high up." (*Id.* at 6.)

During his deposition, Plaintiff testified that he spoke with Defendant Hugie on two occasions about the snitch rumor, in August 2013 on the date he indicated on his 602 appeal, and once before that. (Pl. Dep., ECF No. 150-1 at 11-12.) Plaintiff stated that he did not have any significant conversations with Hugie between August 2013 and the July

2014 attack. (*Id.* at 12.) He confirmed during his testimony that Defendant Hugie never told him that if Plaintiff did not put a hit out on Spears, then something would happen to Plaintiff. (*Id.* at 17.) Plaintiff stated that he had a good rapport with Defendant Hugie and that Hugie was not an officer who had picked on him. (*Id.* at 13.) When asked at his deposition how Hugie factored into the attack, Plaintiff responded, "Hugie was just the messenger." (*Id.* at 18.) Plaintiff testified further about the reason for the attack at his deposition:

> Q. And you don't know why you were attacked, either, right?
>
> A. I didn't do nothing -- it's a combination of things. My name was bad. That's the whole thing how I look at it. They said I was a snitch. So being I put Department of Corrections like that in a bad situation of them not operating the way they supposed to, they rules and procedures and they regulations, actually, it put them in a position to where somebody higher up didn't actually roll down the chain of command to get things done that was supposed to be where actually I'm suffering. . . .
>
> Q. Okay. So to boil it down, you believe that you were assaulted -- you believe the reason you were assaulted is because Hugie and Officer Premdas, outed you as a snitch to other inmates?
>
> A. Yes, sir.

(*Id.* at 21-22.)

Plaintiff testified that other than Appeal Log No. CEN-13-01272, Plaintiff did not file any other appeals about Defendant Hugie. (*Id.* at 28, 30.)

### B. Procedural History

Plaintiff initiated this action by filing a complaint on February 4, 2015, naming four Centinela employees as defendants, Warden Miller, Deputy Warden Janda, Correctional Officer Premdas, and Correctional Officer Hugie. (ECF No. 1.) Plaintiff filed the First Amended Complaint, the operative pleading in this action, on July 24,

2017, naming the same defendants. (ECF No. 22.) On August 7, 2018, the Court dismissed all claims against Defendants Miller and Premdas, leaving only Janda and Hugie as Defendants. (ECF No. 44.) On October 30, 2019, the Court granted a motion for summary judgment filed by Janda and Hugie, leaving only count two of the First Amended Complaint pending against Defendant Hugie. (ECF No. 59.) In count two, Plaintiff alleges that Defendant Hugie violated his Eighth Amendment right to be free from cruel and unusual punishment and his First Amendment right to petition for redress of grievances. (First Am. Compl., ECF No. 22 at 5-6.)

Defendant Hugie now moves for summary judgment on count two of the First Amended Complaint.

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment Under Rule 56

A party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

To successfully rebut a moving party's properly supported motion for summary judgment, "the [nonmoving party] must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the

[nonmoving party's] favor, could convince a reasonable jury to find for the [nonmoving party]." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 323; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A "scintilla of evidence" in support of the nonmoving party's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmoving] party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). While prisoners are relieved from strict compliance, they still must "identify or submit some competent evidence" to support their claims. *Soto*, 882 F.3d at 872. In cases involving a pro se litigant, the court "must consider as evidence all of [the nonmovant's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the nonmovant] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004) (citations omitted).

### III.   DISCUSSION

#### A.   Exhaustion of Administrative Remedies

Defendant first argues that Plaintiff failed to exhaust the claims alleged in count two of his First Amended Complaint, as required by 42 U.S.C. § 1997e(a). (Def.'s Mot., ECF No. 149-2 at 11-14.) Specifically, he contends that Appeal Log No. CEN-13-01272, in which Plaintiff complained that "[t]he word was pass[ed]" by Hugie and Premdas that

he was a "rat" and reported that Hugie stated "it came from high up," did not exhaust the First and Eighth Amendment claims asserted in count two because Plaintiff did not assert that Hugie "actually spread rumors in retaliation for Plaintiff's use of the grievance system" nor did the grievance afford prison officials "full and fair notice" of the assault that occurred nearly a year after Hugie's alleged statements. (*Id.* at 12.) The Court finds that Defendant sufficiently exhausted his administrative remedies against Defendant Hugie.

### 1.   Standards

The Prison Litigation Reform Act ("PLRA") requires that inmates exhaust all available administrative remedies before filing any suit challenging prison conditions, including suits under § 1983. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). An inmate is required to exhaust only available remedies. *Booth v. Churner*, 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance." *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005). Broadly, the purpose of the PLRA exhaustion requirement is to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* (citing *Porter v. Nussle*, 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Because non-exhaustion is an affirmative defense, the defendant bears the burden of proving that an administrative remedy was available to the prisoner and that he failed to exhaust such remedy. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). A defendant "must demonstrate that pertinent relief remained available, whether at unexhausted levels of the grievance process or through awaiting the results of the relief already granted as a result of that process." *Brown*, 422 F.3d at 936-37.

"Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino*, 747 F.3d at 1170. The issue of exhaustion may be raised in a

summary judgment motion. *Id.* "If the [court] holds that the prisoner has exhausted available administrative remedies, that administrative remedies are not available, or that a prisoner's failure to exhaust available remedies should be excused, the case may proceed to the merits." *Id.* at 1171.

### 2. Analysis

Here, the Court finds that Plaintiff has exhausted his administrative remedies against Defendant Hugie. Contrary to Defendant's assertion that Plaintiff did not assert in Appeal Log No. CEN-13-01272 that Hugie "actually spread rumors in retaliation for Plaintiff's use of the grievance system," Plaintiff discussed his prior grievance (Appeal Log No. CEN-13-00524) relating to the housing of unclassified inmates and his drug possession charge in this grievance. (*See* Santana Decl., Ex. B, ECF No. 149-5 at 31, 33.) Appeal Log No. CEN-13-01272 infers that Hugie and Premdas spread rumors about Plaintiff being a snitch and the directive to do so "came from high up" because of Plaintiff's prior grievance. *See id.* This sufficiently alerted prison officials of the nature of the wrong for which Plaintiff sought resolution. *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("A grievance . . . need not contain every fact necessary to prove each element of an eventual legal claim. The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.") (citation omitted). Therefore, making all reasonable inferences in Plaintiff's favor, Plaintiff sufficiently exhausted his First Amendment retaliation claim.

The Court also rejects Defendant's argument that Plaintiff failed to exhaust his Eighth Amendment failure to protect claim. In his grievance relating to Defendant Hugie, Appeal Log No. CEN-13-01272, Plaintiff placed prison officials on notice that staff slandering his name was a "breach of [his] safety and security." (Santana Decl., Ex. B, ECF No. 149-5 at 33.) Plaintiff's claim against Defendant Hugie is premised on his belief that Hugie spread a rumor to other inmates that he was a "rat" or snitch, that being labeled a snitch led to him having "smut" on his name, that other inmates required him to place a "hit" on his cellmate to clear his name, and that he was attacked by other inmates

because he refused to attack his cellmate. Plaintiff's grievance, which he pursued through the third level of review, provided sufficient information about Hugie's alleged role in this series of events, that Hugie told other inmates he was a snitch, to allow prison officials to address the situation. (*See* Santana Decl., Ex. B, ECF No. 149-5 at 31, 33 (first level appeal); *id.* at 26, 28 (second and third level appeals); *see also Griffin*, 557 F.3d at 1121 (requiring grievances to "provide enough information . . . to allow prison officials to take appropriate responsive measures.").) Therefore, Appeal Log No. CEN-13-01272 sufficiently exhausted Plaintiff's administrative remedy regarding his Eighth Amendment claim against Defendant Hugie.

Defendant has not met his burden of showing that Plaintiff failed to exhaust his administrative remedies as to the claims asserted against him in count two of the First Amended Complaint. Accordingly, the Court RECOMMENDS that Defendant's motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies be DENIED.

### B. Causation

Defendant next argues that Plaintiff cannot show that he retaliated against Plaintiff and caused Plaintiff to be assaulted. (Def.'s Mot, ECF No. 149-2 at 15-18.) The Court agrees.

#### 1. Standards under § 1983

Generally, "[l]iability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Thus, a plaintiff must allege facts demonstrating "personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Barren*, 152 F.3d at 1194 ("A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."). A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an action which he is legally required to do that causes the deprivation of which complaint is made." *Johnson*

*v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see also Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019) ("An official is liable under § 1983 only if 'culpable action, or inaction, is directly attributed to them.'") (citation omitted).

Under § 1983, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. *See Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) ("The plain words of [§ 1983] impose liability . . . only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a [constitutional right]."); *see also Estate of Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) ("Causation is, of course, a required element of a § 1983 claim."). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson*, 588 F.2d at 743-44 (citation omitted). Summary judgment may be granted when a plaintiff fails to allege facts demonstrating that the defendant was the actual and proximate cause of a constitutional violation. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

### 2. Eighth Amendment failure to protect claim

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (citations omitted); *see also Labatad v. Corrs. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) ("The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners.") (citing *Farmer*, 511 U.S. at 832-33; *Hearns v. Terhune,* 413 F.3d 1036, 1040 (9th Cir. 2005)). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation only when (1) the official's act or omission was "objectively, sufficiently serious" and (2) the

official was subjectively aware of that risk and acted with "deliberate indifference" to the inmate's health or safety. *Id.*

Additionally, a plaintiff alleging an Eighth Amendment violation must show "that the defendant['s] actions were both an actual and proximate cause of [his] injuries." *Lemire v. Cal. Dep't of Corrs. and Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013); *see also Leer*, 844 F.2d at 633. This showing means that the inmate's injury would not have occurred but for the official's conduct (actual causation) and no unforeseeable intervening cause occurred that would supersede the official's liability (proximate causation). *Conn v. City of Reno*, 591 F.3d 1081, 1098, 1100-01 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011); *see also Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989) ("Federal courts turn to the causation factors developed in the common law of torts to supply the necessary causation factor in the civil rights field."). "Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question of whether the defendant should be legally responsible for the injury. This question is generally referred to as one of proximate cause." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990) (citing W. Prosser & W. Keeton, *The Law of Torts* § 42, at 272-73 (5th ed. 1984)).

In this case, drawing all inferences in Plaintiff's favor, a reasonable jury could not find that Defendant Hugie's alleged conduct—spreading rumors that Plaintiff was a "rat" or a "snitch" because someone from "high up" told him to do so—proximately caused the injuries sustained by Plaintiff in the July 30, 2014 attack. First, the timing of the attack, nearly a year after Defendant Hugie allegedly spread the rumor that Plaintiff was a snitch and made the "it came from high up" comment, does not support a conclusion that the attack was at all related to the snitch rumor. Second, and even more importantly, Plaintiff's own theory of liability does not support that Defendant Hugie's actions caused him to be attacked. Plaintiff theorizes that he was required by other inmates to put a "hit" on his cellmate because he had been labeled a snitch and was attacked when he refused to

do so. Thus, Plaintiff does not claim that he was attacked because Defendant Hugie labeled him a snitch; rather, he claims that he was attacked because he did not place a hit on his cellmate.

An officer's conduct "is not the proximate cause of [a plaintiff's] alleged injuries if another cause intervenes and supersedes [the officer's] liability for the subsequent events." *Conn*, 591 F.3d at 1101 (quoting *White*, 901 F.2d at 1506). On the other hand, "courts are quite generally agreed that [foreseeable] intervening causes . . . will not supersede the defendant's responsibility." *White*, 901 F.2d at 1506 (citation omitted). Here, the conduct of the unidentified inmates who allegedly attacked Plaintiff because he refused to place a hit on his cellmate was the actual and direct cause of the attack. Whether the attacking inmates' conduct supersedes Defendant Hugie's liability depends upon what was reasonably foreseeable to Defendant Hugie at the time of his conduct. *See id.* While other inmates attacking Plaintiff *because he had been labeled a snitch* was a foreseeable result of Defendant Hugie spreading the snitch rumor, it cannot be said that other inmates attacking Plaintiff *because he refused to place a hit on his cellmate*, which he was allegedly required to do because he had been labeled a snitch nearly a year earlier, was a foreseeable result of Defendant Hugie spreading a rumor that Plaintiff was a snitch. The attacking inmates' conduct, therefore, superseded Defendant Hugie's conduct as the actual and proximate cause of the attack. Stated differently, a reasonable jury could not conclude that the other inmates' conduct—attacking Plaintiff because he refused to hit his cellmate—was a foreseeable result of Defendant Hugie spreading a rumor that Plaintiff was a snitch. Accordingly, a reasonable jury could not conclude, based on the alleged facts and circumstances of this case, that Defendant Hugie spreading a rumor that Plaintiff was a snitch was the proximate cause of Plaintiff being attacked by other inmates, nearly a year later, for refusing to hit his cellmate.

Moreover, there is little evidence supporting Plaintiff's Eighth Amendment claim, and his theory of liability is based almost purely on his own speculation. Although the Court must liberally construe a pro se litigant's motion papers and pleadings when

deciding a motion for summary judgment, the pro se litigant is still required to "identify or submit some competent evidence" to support his claims. *Soto*, 882 F.3d at 872. The plaintiff here has provided no evidence, other than his own statement, that two other inmates stated that he had "smut" on his name and therefore had to place a hit on his cellmate to clear his name. Plaintiff has not identified those inmates, has not produced any declarations or testimony from them, and presumably cannot call them as witnesses at trial. Even if Plaintiff's testimony about the conversation he overheard was admissible at trial, he has not produced any evidence supporting the rest of his theory of liability. Plaintiff surmises that the reason he had "smut" on his name was because he had been labeled a snitch, and the reason he was attacked was because he did not place a hit on his cellmate. This theory, however, is based solely on Plaintiff's speculation and lacks any evidentiary support.

There is also no evidence reflecting that Plaintiff felt threatened by the "snitch" label after November 5, 2013, when he filed his second level appeal regarding Defendant Hugie's alleged conduct. After that date, Plaintiff did not file any further grievances reflecting that he had any safety concerns relating to the alleged snitch rumor. Plaintiff's failure to report that he continued to feel threatened by the snitch label in the months leading up to the July 30, 2014 attack, including after he allegedly overheard other inmates saying he had "smut" on his name, further undercuts Plaintiff's theory that the attack had anything to do with the rumor allegedly circulated by Defendant Hugie nearly a year before. Considering all the circumstances of this case and making all inferences in Plaintiff's favor, the Court finds that Plaintiff has not presented sufficient evidence to allow a reasonable factfinder to conclude that Defendant Hugie's alleged spreading of a rumor that Plaintiff was a snitch caused the July 30, 2014 attack on Plaintiff. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to defeat summary judgment.); *Matsushita*, 475 U.S. at 586 (providing that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").

Based on the record before the Court, Plaintiff has failed to raise a genuine issue as to any material fact concerning the requisite causal connection between Defendant Hugie's alleged actions and the July 30, 2014 attack. Causation is an essential element of Plaintiff's Eighth Amendment claim. *See Leer*, 844 F. 2d at 634; *Lemire*, 726 F.3d at 1074. Because Plaintiff has failed to meet his burden of setting forth facts demonstrating this necessary element of his claim, summary judgment is appropriate. *See Celotex*, 477 U.S. at 322. Accordingly, the Court RECOMMENDS that Defendant's motion for summary judgment on Plaintiff's Eighth Amendment claim be GRANTED.

### 3. First Amendment retaliation claim

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote and citation omitted). The plaintiff need not demonstrate that his speech was actually inhibited or suppressed, but merely that the defendant's conduct was such as "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at 568-69. Conduct protected by the First Amendment includes communications that are "part of the grievance process." *Brodheim v. Cry*, 584 F.3d 1262, 1271 n.4 (9th Cir. 2009).

To succeed on a First Amendment retaliation claim, the plaintiff must show a causal connection between the adverse action and the protected conduct. *See Watison*, 668 F.3d at 1114. Thus, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (citation omitted). To show the presence of this element on a motion for summary judgment, a plaintiff "need only put forth evidence of retaliatory motive, that, taken in the

17

light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent[.]" *Id.* (citing *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

In this case, Plaintiff's allegations do not present a genuine issue of material fact regarding whether the motive behind Defendant Hugie's alleged spreading of a rumor that Plaintiff was a snitch was in retaliation for Plaintiff filing his April 15, 2013 grievance (Appeal Log No. CEN-13-00524), in which he contested his drug possession charge and complained about the prison's policy of placing "unclassified transitional inmates" in his cell. Viewing the record in the light most favorable to Plaintiff, there is not a scintilla of evidence that Defendant Hugie knew anything about his prior grievance. Even assuming that a reasonable jury could believe that Defendant Hugie told other inmates that Plaintiff was a snitch, there is no evidentiary support that he did so in retaliation for Plaintiff's protected conduct, filing a grievance. Only Plaintiff's speculation supports this notion. Indeed, Plaintiff's own testimony that "Hugie was just the messenger" undermines his retaliation claim, as it demonstrates that someone "higher up" wanted to retaliate against Plaintiff, and that Defendant Hugie did not know why he had been directed to spread a rumor that Plaintiff was a snitch.

Because Plaintiff has failed to meet his burden of setting forth facts demonstrating causation, a necessary element of his First Amendment claim, summary judgment is appropriate. *See Celotex*, 477 U.S. at 322. Accordingly, the Court RECOMMENDS that Defendant's motion for summary judgment on Plaintiff's First Amendment claim be GRANTED.

### C. Qualified Immunity

Lastly, Defendant argues that he is entitled to qualified immunity. (Def.'s Mot., ECF No. 149-2 at 18-21.) The Court, however, need not address Defendant's qualified immunity argument because it finds that Plaintiff's constitutional claims fail on the merits.

///
///

## IV. CONCLUSION

For the reasons discussed above, Defendant Hugie's Motion for Summary Judgment [ECF No. 149] should be **GRANTED**. This Report and Recommendation will be submitted to United States District Judge William Q. Hayes pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **October 31, 2023**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **November 7, 2023**. The parties are advised that the failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

Dated: October 11, 2023

Hon. Bernard G. Skomal
United States Magistrate Judge